UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TONY DIAZ,
    Petitioner,

        v.                    CR. No. 04-10274-PBS
                              (Related to C.A. 09-11644-PBS)
UNITED STATES OF AMERICA,
    Respondent.

## MEMORANDUM AND ORDER

SEPTEMBER 21, 2012

SARIS, U.S.D.J.

## I. INTRODUCTION

Petitioner Tony Diaz has filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (Docket No. 74) alleging ineffective assistance of his trial and appellate counsel and various court errors. He was convicted, after a jury trial, for possession of a firearm and ammunition by an unlawful alien under 18 U.S.C. § 922(g)(5), and received a sentence of 262 months imprisonment, pursuant to the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). The petition is **DENIED**.

## II. PROCEDURAL HISTORY

On September 28, 2009, Diaz filed a *pro se* petition which asserted that his trial counsel failed: (1) to raise a justification, duress, or self-defense claim; (2) to inform him of his right to testify at trial; (3) to advise him that if he pled guilty instead of proceeding to trial, he would have

received a sentence of no more than 10 years imprisonment; (4) to attack his criminal history score as applied to the ACCA; and (5) to request that the passport and travel documents used in evidence against him at trial be translated into English.

With respect to his ineffective assistance of counsel claims against his appellate attorney, Diaz alleged that his appellate counsel failed: (1) to attack his criminal history score as applied to the ACCA; (2) to raise Amendment 709 of the U.S. Sentencing Guidelines to mitigate his sentence; and (3) to seek a stay until the United States Supreme Court rendered a decision in Arizona v. Gant, 556 U.S. 332 (2009).

Additionally, although not set forth expressly, Diaz challenged this Court's admission of passport and travel documents, as well as the application of the ACCA to enhance his sentence in light of Amendment 709 and United States v. Godin, 522 F.3d 133 (1st Cir. 2008).

On June 9, 2010, this Court issued a Memorandum and Order (Docket No. 89) finding that neither Diaz nor the United States had addressed satisfactorily the complex claims raised by Diaz. Because further briefing was necessary, this Court found it to be in the interests of justice to appoint counsel for Diaz under 18 U.S.C. § 3006A for all further § 2255 proceedings.  On July 1, 2010, Attorney Scott Katz was appointed for Diaz.

After many extensions for good cause shown, on October 13, 2011, Diaz's counsel filed a Memorandum in Support of the § 2255 motion (Docket No. 104), along with other supporting materials. In that memorandum, appointed counsel noted that Diaz, acting *pro se*, initially asserted six grounds for relief. Counsel identified these grounds as: (1) the failure of trial counsel to raise a justification defense (Ground One); (2) the failure to inform him of his right to testify (Ground Two); (3) the misadvising as to his sentencing exposure following a conviction after trial as opposed to a guilty plea (Ground Three); (4) the ineffective assistance of appellate counsel in failing to raise an argument based on Amendment 709 to the U.S. Sentencing Guidelines (Ground Four); (5) the failure of both trial and appellate counsel in their attacks on the applicability of the ACCA (Ground Five); and (6) the ineffective assistance of appellate counsel in failing to seek a stay of the appeal until the U.S. Supreme Court rendered a decision in <u>Arizona v. Gant</u>, 556 U.S. 332 (2009)(Ground Six). The memorandum also noted that on December 17, 2010, appointed counsel filed a status report (Docket No. 95) in which Diaz withdrew his claims asserted in Grounds Three and Six, but still wished to pursue his remaining claims contained in Grounds One, Two, Four, and Five.

On January 11, 2012, the United States filed a Motion Requesting an Order Finding a Waiver of the Attorney-Client Privilege in § 2255 Proceeding (Docket No. 109).  Thereafter, on March 2, 2012, the United States filed a Second Request for Entry of an Order Finding Waiver and Permitting Prior Counsel to Speak with the Government (Docket No. 112).  On March 5, 2012, Diaz filed a Response (Docket No. 113).  That same day, this Court entered an Order Finding a Waiver of the Attorney-Client Privilege by Diaz (Docket No. 115).

On May 15, 2012, the United States filed Memorandum in Opposition to Diaz's Motion to Vacate under § 2255 (Docket No. 116), along with attachments.  In that Opposition, the United States also moved for Summary Dismissal of Diaz's § 2255 motion. Briefing has been completed, and the § 2255 motion is now ripe for review.

A.   Background of Diaz's Criminal Case

The relevant underlying factual background of Diaz's criminal case is as follows.[1]  Early on the morning of July 14, 2004, gun shots were fired at Edison and Henry Gonzalez ("the Gonzalez Brothers") while they were sitting in their car in a

---

[1]    The relevant facts are culled primarily from the appellate decision.  See United States v. Diaz, 519 F.3d 56 (1st Cir. 2008).

4

restaurant parking lot in Lawrence, Massachusetts. <u>Diaz</u>, 519 F.3d at 58. The Gonzalez Brothers called 911 and notified the police that there had been a shooting by a drunk man driving a blue BMW with the license plate number 3703ZE. The Gonzalez Brothers then drove to the Lawrence police station where they met with detectives. Edison advised the detectives that he could identify the shooter and that he knew where the shooter lived, although he did not know the shooter's name. He then went with the detectives to the apartment he believed to be the residence of the shooter, but the shooter was not there. <u>Id.</u>

After the Gonzalez Brothers' call to the police, a dispatch was broadcasted which contained a warning that the shooter might be drunk. Sometime later, a patrol officer spotted a BMW matching the description of the shooter's vehicle and license plate number. He followed the vehicle and requested back up. Several police officers arrived at the scene, at which point four officers exited their cars with guns drawn and ordered the driver out of the vehicle. Two of the officers patted down the driver and placed him in handcuffs. Shortly thereafter, Officer Thomas Caraballo approached the BMW to ascertain whether there were any other occupants, and opened the passenger-side door and leaned into the car. Caraballo then spotted the handle of a gun protruding from beneath the passenger seat and called out to

alert the other officers.[2]  Id. at 58-59.  Contemporaneously,

Detective Burokas arrived at the scene with Edison Gonzalez.

From the back seat of the detective's car, Edison identified the

driver of the BMW (Diaz) as the alleged shooter.  Responding to

Officer Caraballo's discovery of the gun, Detective Burokas

removed a .45 caliber handgun from underneath the front passenger

seat of the BMW.  He unloaded the gun and found three rounds of

live ammunition in the clip.  The driver (Diaz) was then arrested

and taken into custody by the police.  Id. at 59.  During

booking, Diaz gave his name as "Jose Rivera" and provided a date

of birth.  He was advised of his Miranda rights in Spanish, both

orally and in written form, and indicated that he understood his

rights.  An officer asked Diaz (a/k/a "Jose Rivera") in Spanish

whether he had a license to carry a gun, to which he answered

"no," and told the officer that he purchased the gun on the

street for $300.00.  After the officers fingerprinted him, police

conducted a Social Security number check and two names were

_____

[2]    At the suppression hearing, this Court did not find credible
Officer Caraballo's testimony that before opening the car door,
he looked through the window and saw the gun in plain view on the
floorboard in front of the passenger seat.  Nevertheless, this
Court found that generally Caraballo's testimony of events was
buttressed by other officers.  The First Circuit determined that
the evidentiary question whether Caraballo spotted the gun in
plain view or discovered it in the course of a protective sweep
was immaterial as Diaz's Fourth Amendment rights were not
violated.  Diaz, 519 F.3d at 59 n.1.

returned -- "Jose A. Rivera Jr." and "Tony Diaz."  <u>Id.</u>

1.  <u>District Court Proceedings</u>

On September 8, 2004, a federal grand jury indicted Diaz on two counts.  Count I charged possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), and Count II charged possession of a firearm and ammunition by an unlawful alien in violation of 18 U.S.C. § 922(g)(5)(A).  During the criminal proceedings, Diaz moved to suppress the evidence seized by police during the search of the BMW, arguing that the protective sweep of the car after he was handcuffed was a violation of the Fourth Amendment's prohibition on unreasonable searches and seizures.  This Court denied the motion to suppress, concluding that the sweep of Diaz's vehicle did not violate the Fourth Amendment because it was not unreasonable for the police "to conduct a protective search after putting a suspect in handcuffs during a *Terry* stop so that the suspect may be released from handcuffs as soon as police safety is assured."  <u>Diaz</u>, 519 F.3d at 59 (internal citations and quotations omitted).

Thereafter, a three-day jury trial began on November 7, 2005.  During the trial, Joann Sassone, a Records and Information Services Officer for the Boston District Office of Citizenship and Immigration Services, Department of Homeland Security ("DHS"), testified that the alien registration number for Diaz

7

indicated that he was deported in 2001, with no permission to re-enter.  Id. at 59-60.  Additionally, at trial the parties stipulated that: (1) a person named "Tony Diaz," also known as "Santo Romero," was convicted of a felony for which the punishment exceeded one year in Middlesex Superior Court on April 27, 1998; (2) the person convicted of that felony had a birth date of April 7, 1965; and (3) the Lawrence police had sufficient grounds to conduct a Terry stop of the vehicle.  Id. at 59 n.3. Defense counsel unsuccessfully objected to the admission of several of the documents in the alien file based on hearsay and relevance grounds; the documents were admitted into evidence as business records of DHS.  Id. at 60.

The jury found Diaz not guilty on Count I (possession of a firearm by a convicted felon), but guilty on Count II (possession of a firearm and ammunition by an unlawful alien).  At sentencing, this Court imposed an enhanced sentence pursuant to the ACCA based on three of Diaz's prior qualifying convictions. Id. at 61.

### 2.  First Circuit Proceedings

On May 5, 2006, Diaz filed a Notice of Appeal to the First Circuit (Docket No. 57) challenging both his conviction and sentence.  On appeal, Diaz challenged: (1) this Court's denial of his motion to suppress evidence seized from the BMW;(2) the

8

sufficiency of evidence to convict him of being an unlawful alien in possession of a firearm and ammunition; and (3) the enhancement applied to his sentence as a result of previous convictions. The First Circuit rejected all of Diaz's challenges and affirmed the Judgment of this Court. See Diaz, 519 F.3d at 58.

Specifically, with respect to the ruling on the motion to suppress, the First Circuit determined the motion was properly denied, reasoning that "[t]here was ample evidence in this case that the officers actually suspected that Diaz was armed and dangerous and that such suspicion was reasonable in light of the circumstances." Id. at 62 (citing Michigan v. Long, 463 U.S. 1032, 1051-52 (1983)).

With respect to the sufficiency of the evidence concerning Diaz's unlawful alien status, the First Circuit found that the totality of the evidence was sufficient to permit a rational jury to find Diaz's alien status beyond a reasonable doubt. Id. at 65. Additionally, with respect to the passport and travel documents, the court held that "it cannot be said that a 'miscarriage of justice' resulted from the district court's decision to admit the documents without translation." Id. (citing United States v. Morales-Madera, 352 F.3d 1, 10 (1st Cir. 2003)).

Next, with respect to the issue of the sufficiency of the evidence as to Diaz's possession of the firearm and ammunition, the First Circuit held that the government met its burden by proffering sufficient evidence for the jury to find, beyond a reasonable doubt, that Diaz possessed the firearm and ammunition. The First Circuit cited to specific evidence, such as: (1) the loaded firearm was discovered under the passenger seat, within the lunge area of the driver's seat in the car Diaz was driving only moments after the police ordered Diaz to exit the vehicle; (2) Diaz was the only occupant of the vehicle; and (3) detectives testified that during booking Diaz stated he had bought the gun on the street for $300.00. Id. at 66.

Finally, with respect to Diaz's challenge to the ACCA sentencing enhancement, the First Circuit held that the evidentiary standard for conviction under the ACCA is a preponderance of the evidence, and therefore, with no clear error, the evidence supported the conclusion that Diaz was, in fact, the same Santo Romero convicted in April 1998 on drug trafficking charges. Id. at 67-68 (citing Almendarez-Torres v. United States, 523 U.S. 224, 226-27 (1998); United States v. Woodward, 277 F.3d 87, 91 (1st Cir. 2002)). Thus, Diaz's sentence enhancement under the ACCA was not improper.

On October 6, 2008, Diaz's petition for writ of certiorari was denied.  See <u>Diaz v. United States</u>, 555 U.S. 859 (2008). Diaz then filed the instant § 2255 motion on September 28, 2009.

### III.  DISCUSSION

A.  <u>Standard of Review</u>

Section 2255 of Title 28 provides that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released ... may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  "[T]he statute provides for post-conviction relief in four instances, namely, if the petitioner's sentence (1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack."  <u>David v. United States</u>, 134 F.3d 470, 474 (1st Cir. 1998)(citing <u>Hill v. United States</u>, 368 U.S. 424, 426-27 (1962)).

The petitioner bears the burden of establishing the need for relief under § 2255.  <u>David</u>, 134 F.3d at 474.  <u>See</u> <u>Mack v. United States</u>, 635 F.2d 20, 26-27 (1st Cir. 1980).  In order to obtain collateral relief, a petitioner "must clear a significantly higher hurdle than would exist on direct appeal."  <u>United States </u>

<u>v. Frady</u>, 456 U.S. 152, 166 (1982).[3]  Indeed, there is a

presumption of finality of criminal convictions once all direct

appeals have been completed.  <u>Singleton v. United States</u>, 26 F.3d

233, 236 (1st Cir. 1994)(citing <u>Brecht v. Abrahamson</u>, 507 U.S.

619 (1993) and <u>Frady</u>, 456 U.S. at 164-65).  "Postconviction

relief on collateral review is an extraordinary remedy, available

only on a sufficient showing of fundamental unfairness."

<u>Singleton</u>, 26 F.3d at 236.  Additionally, issues disposed of on

direct appeal may not be reviewed in a subsequent § 2255

proceeding absent an intervening change in the law or a showing

that manifest injustice would otherwise result.  <u>See</u> <u>United</u>

<u>States v. Michaud</u>, 901 F.2d 5, 6 (1st Cir. 1990)("We note that

certain other claims raised in the § 2255 motion were decided on

direct appeal and may not be relitigated under a different label

on collateral review.")(citing <u>Tracey v. United States</u>, 739 F.2d

---

[3]    The Supreme Court rejected the plain error standard of
review, stating: "We believe the proper standard for review of
[petitioner's § 2255] motion is the 'cause and actual prejudice'
standard enunciated in <u>Davis v. United States</u>, 411 U.S. 233, 93
S.Ct. 1577, 36 L.Ed.2d 216 (1973), and later confirmed and
extended in <u>Francis v. Henderson</u>, 425 U.S. 536, 96 S.Ct. 1708, 48
L.Ed.2d 149 (1976), and <u>Wainwright v. Sykes</u>, 433 U.S. 72, 97
S.Ct. 2497, 53 L.Ed.2d 594 (1977).  Under this standard, to
obtain collateral relief based on trial errors to which no
contemporaneous objection was made, a convicted defendant must
show both (1) 'cause' excusing his double procedural default, and
(2)'actual prejudice' resulting from the errors of which he
complains."  <u>Frady</u>, 456 U.S. at 167-68.

679, 682 (1st Cir. 1984) and Robson v. United States, 526 F.2d
1145, 1147 (1st Cir. 1975)).

Unless the petitioner claims a jurisdictional or
constitutional violation (such as the ineffective assistance of
counsel), a § 2255 claim will not be considered cognizable unless
"the alleged error presents a 'fundamental defect which
inherently results in a complete miscarriage of justice,' or 'an
omission inconsistent with rudimentary demands of fair
procedure.'" Cofske v. United States, 290 F.3d 437, 441 (1st
Cir. 2002)(citing Hill, 368 U.S. at 428).

With respect to the standard for § 2255 claims raised under
the Sixth Amendment[4] alleging ineffective assistance of counsel,
a petitioner must prove by a preponderance of the evidence that
"(1) counsel's performance was deficient, and (2) the deficient
performance prejudiced the defense." Bucuvalas v. United States,
98 F.3d 652, 658 (1st Cir. 1996); see Peralta v. United States,
597 F.3d 74, 79 (1st Cir. 2010)("To succeed on a claim of
ineffective assistance of counsel under the Sixth Amendment,

_____

[4]    The Sixth Amendment of the United States Constitution states
that: "[i]n all criminal prosecutions, the accused shall enjoy
the right ... to have the Assistance of Counsel for his defense."
U.S. Const. amend. VI.  A defendant is not merely entitled to the
assistance of counsel, but the effective assistance of counsel.
Strickland v. Washington, 466 U.S. 668, 686 (1984).

[petitioner] must show both deficient performance by counsel and resulting prejudice.").

The first prong of the Strickland test is satisfied where counsel's performance is "so inferior as to be objectively unreasonable." United States v. McGill, 11 F.3d 223, 226 (1st Cir. 1993). An attorney's conduct will be reasonable if it is found to fall "within the range of competence expected of attorneys in criminal cases." United States v. Bosch, 584 F.2d 1113, 1121 (1st Cir. 1978)(citations omitted). Moreover, courts have stressed that "effective representation" is not synonymous with "errorless representation;" the courts' review of counsel's performance must be deferential, and reasonableness must be considered in light of "prevailing professional norms." Peralta, 597 F.3d at 79 (citing Strickland, 466 U.S. at 688). The prejudice prong of the test requires that Diaz show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Smiley v. Maloney, 422 F.3d 17, 20 (1st Cir. 2005)(citing Strickland, 446 U.S. at 694).

B.   <u>Ground One: The Failure of Trial Counsel to Raise a Justification Defense (Self-Defense and Duress)</u>

Diaz argues that trial counsel's performance was deficient because a justification defense should have been presented as viable under the Leahy standard.  United States v. Leahy, 473 F.3d 401, 409 (1st Cir. 2007).  Leahy outlined the four elements a defendant must prove to succeed on a justification defense, as provided by the Supreme Court in Dixon v. United States, 548 U.S. 1 (2006).  This framework is:

> (1) The defendant was under an unlawful and imminent threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) the defendant had not recklessly or negligently placed herself in a situation in which it was probable that she would be forced to perform the criminal conduct; (3) the defendant had no reasonable, legal alternative to violating the law, that is, a chance both to refuse to perform the criminal act and also to avoid the threatened harm; and (4) that a direct causal relationship may be reasonably anticipated between the criminal act and the avoidance of the threatened harm.

See Dixon, 548 U.S. at 4 n.2; Leahy, 473 F.3d at 409.

Here, Diaz avers that he was prepared to testify to the following facts that would have satisfied all four of these elements.  He was involved in a contentious and escalating relationship with the Gonzalez brothers, who were relatives of his ex-girlfriend, Agueda Marcede ("Marcede").  The relationship had ended before July 2004.  He was told by her that the Gonzalez brothers twice vandalized his car shortly afterwards.  Marcede

15

called him to tell him that the Gonzalez brothers had
smashed the window and were going to harm him.  Defendant had a
confrontation with them before the July 13 incident in a
restaurant parking lot, where they had chased Diaz and fired guns
either at him or into the air.  Because he feared for his safety,
he bought a gun and ammunition for protection.  When he next saw
the Gonzalez brothers at the LA Grille, they threatened him
again.  Thus, he contends he had a well-grounded apprehension of
death or serious bodily injury from these brothers.

Diaz alleges that his trial counsel was deficient because he
conceded that the government had strong evidence to prove all of
the four elements necessary to convict him of possession of a
firearm and ammunition by an illegal alien, and his only hope was
a justification defense.

The question is whether it was objectively reasonable for
Diaz's trial attorney to focus on the defenses that he did not
knowingly possess the gun and was not a felon and to not raise a
justification defense.  As the government points out, Diaz's
trial counsel faced substantial legal and factual obstacles in
presenting a justification defense.

Trial counsel faced a fundamental legal impediment to the
justification defense, namely, Diaz's failure to enlist
assistance from law enforcement.  "[E]nlisting protection from

law enforcement or other entities is generally a 'reasonable,
legal alternative to violating the law.'" <u>United States v.
Burnes</u>, 666 F. Supp. 2d 968, 972 (D. Minn. 2009)(citing <u>United
States v. El-Alamin</u>, 574 F.3d 915, 926 (8th Cir. 2009).  Diaz has
stated that his alien status was the motivating factor in Diaz's
steering clear of the police.  <u>See</u> Diaz's Memorandum (Docket No.
75 at 6)(stating that "the only reason he did not press charges
[concerning his shattered car window allegedly damaged by the
Gonzalez brothers] or file a police report is because of his
illegal alien status").  The Court agrees with the government
that Diaz's choice to buy a gun and not to contact authorities
cannot be used as a justification defense.

        Moreover, trial counsel faced a daunting hurdle in
reconciling the evidence concerning Diaz's possession of the gun
because Diaz changed his story about who owned the gun.  Diaz
told the police during booking that he bought the gun on the
street for $300.00, and then later claimed he wrestled the
Gonzalez brothers for the gun.  <u>Compare</u> <u>Diaz</u>, 519 F.3d at 59
(noting that Diaz told police at booking that he purchased the
gun on the street), <u>with</u> Diaz Affidavit (Docket No. 76 at 2, ¶
2)(where Diaz avers that he told his trial attorney that the
Gonzalez brothers had pulled out a firearm on him while at the LA
Grille, and that soon after they were involved in a wrestling

match), <u>and</u> Diaz Affidavit (Docket No. 104-1, ¶ 2)(stating he purchased the handgun prior to July 14th but did not remember the exact date).[5] In sum, based on the legal impediments to a justification defense, the conflicting factual evidence, and the major credibility problems caused by defendant's serious criminal background, Diaz has not met his burden to show that his trial counsel's decision not to present such a defense constituted a deficient performance.

C. <u>Ground Two: Failure to Inform Diaz of The Right to Testify</u>

In Ground Two, Diaz contends that his trial counsel failed to advise him of his right to testify and never discussed the possibility of having him testify. He claims that had he been advised of his right to testify, there was a reasonable probability that the outcome of his trial, or his sentencing, would have been different.

---

[5] In his later Affidavit attached to his Memorandum in Support of § 2255 motion (Docket No. 104), Diaz submits that he previously submitted an Affidavit (referenced as Docket No. 75 but is presumably Docket No. 76) that contained a different version of events. He claims this earlier Affidavit was drafted with the assistance of a jailhouse lawyer who either misunderstood what Diaz had told him or thought he could help him by embellishing what had happened. Diaz says he does not read English well and did not carefully review that Affidavit or have it fully translated into Spanish prior to signing it.

Next, Diaz claims that had he testified, and had the justification defense been presented at trial, his self-protection defense would have provided mitigating evidence that would have served as a basis for a non-guideline sentence.

In opposition, the government points to Diaz's extensive association with the criminal justice system, dating back to 1988. In light of this, it argues Diaz's claim that he was unfamiliar with the concept of the right to testify is not credible. Next, the government submitted an Affidavit of Diaz's trial counsel. See Attachment B (Docket No. 116-2). In that Affidavit, trial counsel outlines his extensive litigation background, stating that he has tried over 100 cases in the state and federal courts. Trial counsel notes that he and Diaz met many times in preparation for trial. Diaz only agreed to enter a plea if a certain amount of incarceration was imposed. He never agreed to plead guilty because he thought the government's offers were unfair. Further, trial counsel's notes indicated that he and Diaz specifically discussed trial strategy, including the justification/necessity defense, and that an interpreter (a firm associate) was used in order to ensure that there was no communication problem between counsel and Diaz. Trial counsel determined that such a defense would not be available because there was no legal support for the argument that Diaz's alien

status precluded him from seeking police assistance or from escaping before using violence. Trial counsel noted that in order to present a justification defense, Diaz would have had to testify. Based on his multiple convictions and other factors, "[t]his would have completely prevented any strategy casting doubt that the defendant was previously convicted of a felony or that he did not know there was a gun in the car when the police stopped him." Id. at 4, ¶ 5. Counsel also states that he followed his usual practice at that time by giving Diaz advice regarding testifying, but he left the decision up to Diaz about whether or not he would testify. Counsel further avers that at trial, the issue was again discussed with Diaz, and Diaz made clear that he did not want to testify at trial. Id. at 4, ¶ 6. In light of this, the government contends that Diaz has not met his burden as to Ground Two regarding the failure to advise of his right to testify.

The record presents a fact dispute as to whether defendant was informed of his right to testify. However, a hearing is not necessary because even if he had been informed, there is no showing of prejudice because a justification defense was not viable. In light of the multiple aliases and extensive criminal record, together with the trial record, Diaz's testimony on

justification would likely not have been credible to a jury. Indeed, as stated above, the defense was not legally viable.

Additionally, at sentencing, Diaz was offered the opportunity to speak in light of the sentencing recommendation, and he declined to do so. Thus, when given the opportunity to provide a mitigating circumstance, he declined to do so.

Accordingly, the government's Motion for Summary Dismissal (Docket No. 116) is <u>ALLOWED</u> as to Ground Two of Diaz's § 2255 motion.

D.  <u>Ground Four: Failure of Appellate Counsel to Raise an Argument Based Upon Amendment 709 While a Direct Appeal Was Pending</u>

As noted above, Diaz was sentenced to 262 months imprisonment based on the finding that he was an armed career criminal under the ACCA, pursuant to U.S.S.G. § 4B1.4(b)(3)(A). The three predicate offenses upon which this Court relied are contained in ¶¶ 42,[6] 45,[7] and 46[8] of the PSR.  <u>See</u> Memorandum

---

[6]     The conviction in ¶ 42 was a 1990 conviction in the Suffolk Superior Court for cocaine distribution. Diaz received a 4-6 year sentence on June 5, 1990.

[7]     The conviction in ¶ 45 was a 1998 conviction in the Middlesex Superior Court for cocaine trafficking. Diaz received a sentence of 5 years to 5 years and one day on April 27, 1998.

[8]     The conviction in ¶ 46 was a 1996 conviction in the Worcester Superior Court for distributing a Class B substance (cocaine). Diaz received a 2-4 year sentence on August 5, 1996.

(Docket No. 104 at 14, Ex. E. at 5, 7, 11 (Sentencing Hearing
Transcript)).  This sentence was the low end of the Sentencing
Guideline range (262 to 327 months) using a total offense level
of 34 and a criminal history category VI.

While Diaz's appeal was pending, the U.S. Sentencing
Commission proposed Amendment 709 to the Sentencing Guidelines.[9]
Amendment 709 was proposed in May 2007 and became effective on
November 1, 2007.  It restated the rules for determining when
multiple crimes are to be counted as one for criminal history
calculation purposes.  U.S.S.G. § 4A1.2(a)(2) (as amended by
Supp. to App. C., Amend. 709).

Amendment 709 provides:

Prior sentences are counted separately if the sentences
were imposed for offenses that were separated by an
intervening arrest.  If there is no intervening arrest,
prior sentences are counted separately unless (A) the
sentences resulted from offenses contained in the same
charging instrument; or (B) the sentences were imposed
on the same day.

Id.

Diaz contends that his appellate counsel should have
advocated for the application of Amendment 709 in order to
undermine the enhancement of his sentence under the ACCA.  He

---

[9]    Diaz was in a relatively unique position because Amendment
709 was proposed _after_ he filed his notice of appeal; however it
became effective _during_ his appeal and _before_ his conviction was
affirmed.

claims that if the conviction set forth in ¶ 44 of the PSR was combined with the conviction set forth in ¶ 42 of the PSR (because the sentences were imposed on the same day and ordered to run concurrently), it would have changed his criminal history category calculation in the PSR, and reduced it from a criminal history category VI (based on 15 points) to a criminal history category V (based on 12 points).

Diaz concedes that the First Circuit has made clear that Amendment 709 is <u>not</u> retroactive and therefore its application is not mandatory. This is because retroactive amendments are listed in Section 1B1.10(c), and Amendment 709 is not among them. <u>See United States v. Ahrendt</u>, 560 F.3d 69, 78-79 (1st Cir. 2009); <u>United States v. Godin</u>, 522 F.3d 133, 134-35 (1st Cir. 2008). Nevertheless, Diaz argues that the First Circuit recognized that the change in policy might have altered the district court's <u>discretionary</u> authority at sentencing.[10] <u>Id.</u> at 136. Diaz now seeks to have this Court exercise discretionary authority to resentence him.[11] The argument in support is that "[a]lthough

_____

[10] In the Memorandum and Order (Docket No. 89) entered on June 11, 2010, this Court considered that further briefing on the Amendment 709 issue was necessary in light of <u>Ahrendt</u> and <u>Godin</u>. The peculiar posture of Diaz's case was a key factor in directing the appointment of counsel.

[11] The First Circuit stated: "[A]s the judge's discretion is no longer rigidly controlled by the guideline range, the judge is

Amendment 709 would not have changed Diaz's guideline range --
because the guideline range was based on his designation as an
armed career criminal -- it would have changed the criminal
history category that would have applied absent the armed-career-
criminal designation."  Memorandum in Support of § 2255 Motion
(Docket No. 104 at 15).  In effect, this would have changed from
15 criminal history points to 12 criminal history points, placing
Diaz (apart from his designation as an armed career criminal) in
category V.

In light of this asserted change in criminal history points,
Diaz argues that appellate counsel was ineffective insofar as he
did not receive the benefit of a remand for resentencing because
appellate counsel failed to request it.

Even if this Court were to adopt Diaz's argument with
respect to the application of Amendment 709 so that the result
was a three-point reduction in the total offense level and a
decrease in his criminal history category to category V (making

---

free to consider the Commission's current thinking for whatever
use it may be in exercising the court's judgment about the proper
sentence."  Godin, 522 F.3d at 136.  Similarly, in Ahrendt, the
First Circuit followed Godin and remanded the case for
resentencing, stating: "[a]lthough the district court is under no
obligation to modify Ahrendt's sentence, we nevertheless think it
prudent to allow the court the opportunity to consider the
Sentencing Commission's updated views."  Ahrendt, 560 F.3d at 80.

the guideline range 235 to 293 months instead of 262 to 327 months), this Court would not, in its discretion, change Diaz's 262 month sentence.  Of particular significance is the fact that, at sentencing, this Court considered the danger to the community that Diaz presented based on his criminal sentence and sought a sentence that would act as a deterrent to his returning to the country.  Application of Amendment 709 would not have changed this Court's sentencing decision at that time.

Accordingly, the government's Motion for Summary Dismissal (Docket No. 116) is **ALLOWED** as to Ground Four of Diaz's § 2255 motion.

E.    Ground Five: Failure of Trial and Appellate Counsel to Attack the Applicability of the ACCA

In his *pro se* pleadings, Diaz argues that he received ineffective assistance of counsel in failing to challenge application of the ACCA.  Appointed counsel has not briefed this ground, and disassociated himself with the argument. Specifically, Diaz contends that: (1) the three predicate offenses were not proven beyond a reasonable doubt; and (2) he did not have three predicate offenses.  The government has not responded to these arguments.

These various *pro se* arguments either are without merit, have been rejected by the First Circuit, or are too poorly

developed to understand.  See Diaz, 519 F.3d at 67; see also

United States v. Charlton, 600 F.3d 43 (1st Cir. 2010); United

States v. Earle, 488 F.3d 537, 549 (1st Cir. 2007).

Accordingly, for all the reasons set forth above, the

government's Motion for Summary Dismissal (Docket No. 116) is

**ALLOWED** as to Ground Five of Diaz's § 2255 motion.

### III.  CONCLUSION

Based on the foregoing, it is hereby Ordered that:

1.  The United States's Motion for Summary Dismissal of
    Petitioner's § 2255 motion (as contained in its Opposition,
    Docket No. 116) is **ALLOWED** as to Grounds One, Two, Four, and
    Five;

2.  Ground Six and Ground Three are **DISMISSED** as withdrawn by
    petitioner;

3.  Petitioner Diaz's Motion to Vacate Under 28 U.S.C. § 2255
    (Docket No. 74) is **DENIED** in its entirety;

4.  Petitioner's § 2255 action (opened as Diaz v. United States,
    Civil Action No. 09-11644-PBS) is **DISMISSED**; and

5.  Pursuant to Rule 11(a) of the Rules Governing Section 2255
    Proceedings for the United States District Courts (requiring
    the district court to issue or deny a certificate of
    appealability when it enters the final order), this Court
    hereby **DENIES** a Certificate of Appealability.


SO ORDERED.


                              /s/ PATTI B. SARIS
                              Patti B. Saris
                              United States District Judge